We have several motions for admission to the Bar today. Judge Schall is going to make the first motion. Yes. Thank you, Judge Wallach. And I would like to ask my law clerk, Jennifer Veen, to stand up, please. And I move the admission of Jennifer Veen, who is a member of the Bar and is in good standing with the highest courts of the Commonwealth of Virginia and the District of Columbia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. I would just like to very briefly add in support of my motion, those are kind of the formal official words that have to be spoken. Just to put a teeny bit of gloss on it, I would say that Jen has been an excellent clerk. It's been a delight this year to have her in Chambers, and I know that she will be an excellent addition to the Bar of the Court if my motion is granted. Thank you. Having conferred with Judge Strano, the motion is granted. Why don't you do them all together? And at this point, I have a motion, so I'm going to recuse myself from the vote and I'll pass that on over to Judge Schall. I actually have a motion for two of my clerks, or two motions depending on how you look at it. And I'd ask them to please rise, both please rise. And I'm going to move both of them separately, but I want to talk about them together. And that's because there's so many similarities. And that includes that one of them speaks Turkish and the other speaks Arabic. They both speak fluent French. They were both editors of their respective law reviews. And having said that, I'll say a little bit more as I move them. I begin by moving the admission of Christopher Mullins Tipler, who is a member of the Bar and in good standing with the highest court of the Commonwealth of Virginia and the District of Columbia. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. Mr. Tipler is, of course, an outstanding lawyer. He has a particular interest in national security law. He was a soccer player at the University of the South. And he's a fine and interesting person. And I move that admission. We've considered the supporting papers and the presentation. The motion is granted. And now I move the admission of Leslie Esbrook, who is a member of the Bar and is good in good standing with the highest court of New York. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. And Ms. Esbrook is a Chicagoan, a graduate of Yale Law School, and like me, likes to cook. She's a baker. I'm not. And I move the admission of Ms. Esbrook. And that motion, too, is happily granted. Thank you so much. Our first case is Kite Pharma v. Sloan Kettering Institute. Counsel, ready to proceed? Yes, Your Honor. You're reserving three minutes. Yes, Your Honor. May it please the court. Respectfully, the board below erred in applying an overly restrictive legal standard for obviousness. The board rejected Kite's obviousness theory based on its finding that one skilled in the art would not have been motivated to improve upon the construct in Krauss, which was an antibody fragment attached to the CD28 signaling sequence that she disclosed, and making that into a three-part car by adding the CD3 Zeta primary signal that was taught in Finney. In the blue brief, you argued that the PTAB's fact findings with respect to Kite's other rationales, which included the teaching away findings, quote, provide nothing that can salvage its lack of fact finding on the first rationale. Where in the brief did you challenge the PTAB's actual fact findings on the teaching away issue? We did not challenge that in the opening brief, Your Honor. We did not consider the teaching away findings to be relevant with regard to the rationale one. Then why is it Sloan prejudiced, given that it's not had an opportunity to respond to your reply brief argument? Your Honor, I believe that Sloan fully addressed the teaching away argument in their brief, in their respondent's brief, and they had the opportunity to ask the court for additional briefing if they thought they needed additional briefing on that. We believe that the issue is properly before the court. If I can explain the reason that we did not believe that the teaching away finding applied to rationale one, I think that's relevant here, because I think at a very minimum there was an ambiguity. Given that the PTAB says the teaching away finding supports its determination as to ground one, which is obvious in Selbert Krauss, Finney, and Arrufo, rather than rationale one, doesn't that indicate that its teaching away finding applies to all rationales under ground one? I don't think they ever said that they were applying the teaching away finding to rationale one, Judge Wallack. What they said was in their rationale was very brief. Their explanation for their decision was very brief on rationale one. They said that Kite had not distinguished expressly between the advantages of Krauss' CD28 sequence versus Finney's or explain why one of ordinary skill would have been motivated to retain Krauss' CD28 reference over Finney's when combining two references. This is at 13 and 14 of the appendix. And then when they did refer to the other rationales, what they specifically said is if we impute the alleged advantages of Krauss' CD28 sequences discussed with regards to rationales two and three to rationale one, then rationale one rises or falls with rationale two. But at JA22, the PTAB begins its teaching away finding by saying the foregoing subsections provide a sufficient basis on which to conclude that Kite has not carried its burden of persuasion as to ground one and that teaching away, paraphrasing, finding, quote, is an additional related reason that further supports this conclusion. Well, there, Your Honor, they refer to ground one, but ground one encompassed the three rationales. They didn't specifically say that they're applying that finding with regard to the first rationale. And if I could take a moment to explain why this is not just a matter of… All rationales includes the first one. Ground one included all rationales. That's correct, Your Honor. But I think there's an important distinction between the two rationales that the board did not recognize and is the reason that we had understood that the teaching away finding was not focused on rationale one as opposed to rationale two. Rationale two, to some extent, was a more difficult showing that Kite had presented for itself, which was Finney had a three-part car that was disclosed. And the argument there was that a person of skill in the art would look at that and say this isn't good enough. There's something that could be made better about it. And what can be made better is you can take out the CD28 sequence that Finney uses and replace it with another one. And that's where the board was talking about the issues of superiority and teaching away and why someone would be dissuaded from doing that. Rationale one was a different rationale, which started from Krauss, where Krauss was doing testing to show that she could, through her construct, obtain a vibrant costimulatory effect in natural T-cells. And that's very important because Finney did not test in natural T-cells. So there are two aspects of the immune response. One of them is cytokine production, IL-2 production. One of them is proliferation of the cells, and one of them is survival of the cells, because if the cells are activated by a primary signal but don't get the secondary signal, they die. She tested each of the three of these to see if when the CD28 sequence, instead of directly binding to its natural ligand, was instead attached to an antibody fragment that bound to a particular antigen, whether she could promote the same and provoke the same healthy response that you would get from the direct binding. And she found that, and she found that in healthy T-cells. So Krauss is a very, very important reference for one of skill in the art, because it showed that the sequence that she used worked beautifully. There's no suggestion that there's anything wrong with that sequence. And for that rationale, the only issue was whether one would then be motivated to then take what she had done, which was a sequence that worked perfectly well, there's no suggestion in any of her reference that there's anything wrong with the sequence, and would think to then take Finney's suggestion that you can not only take a single signaling domain, but you can take both the primary and the secondary signaling domains, put them into a single chain attached to a variable fragment of an antibody, and create a three-part car that will function properly. And the board in its finding... So the board didn't make any finding that one of skill in the art, at the time of the invention, would not have thought that that was an option that would work. But the board, in its teaching-away finding, it says, I'm quoting, the prior art fails to provide a motivation to include the MYPPY motif found in Krauss' CD28 sequence in a dual-signal chimeric TCR, and therefore found the prior art would have discouraged the ordinary skilled artisan. And in rationale one, the PTAF found Kite failed to demonstrate the Posita in developing a dual-signaling chimeric TCR ellipsis would have been motivated to retain Krauss' CD28 over Finney's when combining the two references. Why doesn't the PTAF's finding about a Posita being discouraged from retaining CD28 which uses the MYPPY amino acid motif, directly tie into whether Posita would have retained Krauss' CD28? Well, our understanding of the board's decision, and I'll answer your question as to what Kite understood in its opening brief. I'll then move on to the issue of the teaching-away finding itself if the court were to consider that on the merits. Our understanding was that there was a distinction in the rationales that was relevant to whether teaching-away was something that the board was relying on or not, which was that, and this goes back to the law that we cited, including the Bayer-Watson case, 874 F. 3rd, 1316, where the court held that obviousness does not require that motivation be the best option, only that it be a suitable option from which the prior art does not teach away. For purposes of the second rationale, we clearly had the obligation to show that someone would have thought to change things. And that was an either-or proposition for the second rationale. You had to decide. You already had a sequence that was taught by Finney. There had to be motivation for somebody to say, that's not good enough, I need something else. And for that one, it really is a matter of you look at the two side-by-side and what would someone of skill in the art think was better. And that's where we thought the teaching-away finding went. But it's a little bit different, and Your Honor, I don't believe this is just semantics. I think there's a difference with rationale one, which is rationale one is, if you start with Krauss, and Krauss says, hey, what I've done works terrifically, it's great, and there's nothing in Krauss to suggest there's anything wrong with it, then the question there was simply, would someone have thought to take this and then to try to add the primary signal and make this into a three-part car. And for that purpose, there was no suggestion that there was anything that would preclude someone from thinking that the Krauss sequence would work. For that purpose, it's not either-or. For that purpose, CD28 sequence she used, it doesn't have to win a head-to-head battle against Finney's, which is the reasoning that the board used, which we believe was erroneous. The board seemed to suggest that- I'm sorry, why isn't the concern, which certainly has some evidence in the record to support it, the same concern that the board discussed in the teaching-away section, why would not that be obviously relevant to the Krauss is good, but maybe we can make it great, the rationale one. That is, maybe we can make it even better in this way if this way carries a risk of friendly fire. Your Honor, our understanding of the board's decision was that what the board was saying when it was discussing the teaching-away, it was that someone would be motivated not to have replaced or substituted the CD28 sequence with the one in Krauss because of the issues that the board addressed. Right, but the way the board discusses rationale one, at least I understood to be if rationale, if you start with Krauss and you think, can we add the thing that's in Finney but not in Krauss, then why would you keep the, is it, can one say My Puppy? I've never heard My Puppy or Mippy. I mean, you've got to be able to say My Puppy, right? The My Puppy sequence. Instead of swapping out that piece of it for the version of CD28 that's found in Finney and you would need a reason to say, I'm not going to do that, and all the teaching-away stuff would bear on that reason, would it not? I believe, Your Honor, that it could have, but the way that the court, the way that the board described what it was doing, its reference to rationales two and three, it did say, and we do find, we consider this to be a somewhat ambiguous sentence. It says, if we impute the alleged advantages of Krauss's CD28 sequence. Well, put aside the question of preservation of the argument. Just on the merits, why is the rejection of rationale one not supportable on the board's reasoning as to teaching away? I'm using several short answers. I understand. Thank you, Your Honor. Let me turn to that quickly. There are two reasons. One is that the board relied almost entirely upon post-invention date priority prior art. There were only two references that involved CD28 at all, and both of them were several years after the 2002 claim date of the invention. The only prior art reference that the board relied on was Capon. Capon did not involve CD28. It didn't even involve extracellular sequences. It just involved transmembrane proteins, and it talked about if you're making a carte that you want to avoid having these transmembrane proteins. Remember, you're under your rebuttal time. You might want to talk fast. Thank you, Your Honor. But the other references, the Hombeck reference does not involve CD28, and the Korchendorfer reference and the Kowaluk reference, neither of them say that there actually is a problem with binding with this extracellular domain. They postulate that there's a possibility that there might be. Korchendorfer actually goes on to say, we thought there might be a problem. We weren't sure because you need a particular folding, a three-dimensional folding of the CD28 sequence to have this off-target binding. We tested it, and it wasn't there. So Korchendorfer later shows that there's no such problem, and we think that under the law it has to be the case that the concern had to exist as of the time of the invention because otherwise it could not have dissuaded someone of skill in the art. And I just very quickly want to make sure that I mention to the Court, the Board, as indication of the error that the Board made in its teaching wayfinding, is there was evidence. Krauss had done a test to see if she would get off-target binding, and this is discussed at Appendix 766 through 69 and 1230 through 1233. She had added her construct to T cells where she provoked the primary signal using the antibody for the CD3, but she didn't add the antibody that caused her construct to fire and to give the costimulatory sequence. So she tested that, and then she had it side-by-side in a culture where she did have the CD28 with the binding with the antibody receptor. And if there had been this off-target binding, she would have seen it. Because in that first example where she didn't tie her CD28 construct to the antigen to which the antibody bound, it couldn't have bound to anything. That could not have been the cause of any signaling. The signaling would have resulted from this off-target binding that the Board talked about. But as shown in Table 2 of her reference, there was no IL-2 production or presentation over and above that of a control that had no possibility of costimulatory binding. And the Board simply ignored that evidence, which was itself demonstrative that there neither was a concern about off-target binding, and Krauss herself was evidence that off-target binding would not have dissuaded using her sequence. Thank you. Thank you, Mr. Dan. Nice tie. Thank you very much, Your Honor. May it please the Court, Morgan Chu on behalf of the Sloan Kettering Institute for Cancer Research. Good morning. There was an extensive factual record before the Board. If we find that Kite waived any challenge to the PTEB's teaching away rationale, is it appropriate for us to deny the motion to strike as moved? It could be, depending on the reasoning of this Court on the other issues. So there was this extensive factual record, 256 exhibits, seven depositions, seven declarations, and other materials, and the Board made findings of fact. Can I ask you, what is the evidence from the prior art about the worry of off-target binding when you had this sequence sticking out into the extracellular domain? First, there was a clash among the experts, Dr. Brocker for Sloan Kettering and two experts for Kite, both Bajorath and Dr. Abkin. What the Board found and credited Dr. Brocker with was a well-reasoned opinion based on references. Here are the references. There's the Capon reference. That's the one that I think your friend said is the sole one that predates the priority data. He said that, but there were other references of great importance that were in the prior art. There is the Kariv reference and the Greenfield reference. And what those two references stood for is that it was well-known in the art that my puppy would bind to naturally occurring ligands in perfectly healthy cells, B7-1 and B7-2. And why is that important here? T-cells themselves have that ligand, B7. So a T-cell might bind to itself and, importantly, might bind to its friendly soldiers, its neighboring T-cells, and kill those neighboring T-cells. So that's a very, very important point here. Now, there is the question about the other three references. So I think you said that the prior art that you just mentioned recognized the affinity of my puppy for the B7-1 and B7-2. Did it connect that to a problem of killing the T-cells, or is that little bit, what, was it Brocker? Is that his name? Yes, Dr. Brocker. Is that what Brocker fills in that a person of skill in the art would have if it bound to B7-1, B7-2, then that would, of course, be this obvious problem and nobody said it specifically, but everybody knew it? Yes. Is that the idea? Basically, yes, but we also have the concern expressed in KPON. And then Dr. Brocker is also looking to art that comes after the filing data, the 190 patent. So let me address an argument that was first made in the reply brief. The other side points to a board decision. So it's not a Federal Circuit decision trying to argue you can't look to anything post the filing date. So I'd like to cite a Federal Circuit decision. It's Monarch Knitting. It's 139F3, 877, and the relevant pages start at 884. That involves a discussion of a reference that is not prior art. And then this court goes on to discuss skepticism and whether that reference can be considered, and then specifically says that teaching away is a certain brand of skepticism. So it's giving credit to a reference that is not prior art. Can I ask, is there something, one version of the narrative from the other side, and I may be unfairly characterizing it, is that before the priority date, this problem wasn't really recognized. It came to be recognized after. What might have changed on that narrative to create a recognition that might not have previously existed? And if your answer is nothing, then I guess I'm curious. Yes, yes. There was no trigger. There was no reason for persons of skill in the art or extraordinary skill in the art to say, by the way, we know that B71 and B72 naturally occur. They knew that. There was no reason, as established by the references I've already cited, that my puppy would bind to them. And that, of course, would create a problem. Can I ask you, I think this probably turns quite heavily on some specifics. So can you address the portion of his argument, as I understand it, that says there's something actually in Krauss, an experiment that shows by the absence of certain sorts of results, that this really would not have been a problem. And since Krauss is prior art, then there's something in the prior art that actually suggests that you shouldn't be worried about this. Right. So this is a reference to Table 2 in Krauss. First, the board. Do you happen to have the page where I can look at that? Yes. I have it. 361? Yeah. Okay. The discussion of Table 2 actually starts on the prior page. But first, let me just give the big picture. Let's remember what Krauss is doing. It's not redirecting a T cell to a new human-specified target. That's what Finney does. Krauss is leaving Signal 1 alone. It's leaving the T cell to identify for itself its target. Krauss is now only looking at Signal 2 and asking, how can we make Signal 2 better? So the way it works for a normal T cell with no changes to it, Signal 1 identifies the target, binds to the target, and then there's a separate second binding of Signal 2. In that circumstance, and in Krauss, there is no safety concern. Because the safety concern for a chimeric TCR with a single binding event is that that receptor may bind to something it doesn't want to bind to, and that would be off-target binding. So Krauss is doing an experiment just saying, how do I, or what has occurred with respect to Signal 2? And it's an in vitro experiment. So it's putting things in a dish. It's not inside the human body. And that's what she's looking at. She is not studying whether the My Puppy motif in her Signal 2 receptor is or is not binding. And in fact, the board directly addresses this at Appendix 22 through 24. And here's what the board says. There is this clash on the kite side, Bargerath and Apkin, and Dr. Brocker on the other side. I think the key passage is at the second half of Appendix 23. And the board finds that Dr. Apkin admitted that endogenous CD28 is in this mix. That's at the bottom of that page. And then at the top of the following page, the board says, Dr. Apkin also admitted that this could cause the signaling. There's a quote to the effect of, it can, but it's not proven. That, I think, when an expert is trying to speak for one side or the other, amounts to an admission. So Krauss was not trying to measure the binding. It's all made-up lawyer argument. And second, there are no controls in Krauss to measure the binding of My Puppy. So I just want to give the overall context, because I think it's very helpful in support of the board's findings. Let's start with Phinney. Phinney has human beings that say, we're going to change the antigen target for this T cell. We're going to specify it. And we're going to change what signaling will occur for signal one. Second, what we're going to do is not have two separate binding events, but a single binding event. And that's what gives rise to the safety concern. Because if that receptor might bind to a friendly cell, or a cell that's not being targeted, it can be a real problem. In contrast, here's Krauss. Leave alone signal number one. We're going to rely on the T cell's natural ability to identify a specific antigen target. And number two, how do we improve signal number two only? And therefore, there's no safety concern. Because the safety is provided by signal one. You have to have both to trigger the robust response of the T cells. So, it doesn't really matter whether the argument is start with Krauss, start with Phinney, combine the two. But the board specifically found that there wasn't a motivation to start with Krauss. And in addition, found there was a teaching away, no matter how you mixed and matched rationales one, two, and three. And here's the problem. Known in the art, as testified to by Dr. Brocker, supported by key references, where you would stay away from putting my puppy into a Phinney-like T cell. Because that could bind to B7-1, B7-2, naturally occurring ligands. It could bind to itself. It could bind to its fellow soldiers that look exactly like it until those T cells as well as other cells not intended to be targets. Those were factual findings that were well supported. If there are no other questions. Thank you, Mr. Chief. Thank you very much. Well, Mr. Dean, you used up your time and you knew you were using it up. I'll give you one minute. When that red light goes on, stop. Just very quickly, Your Honor. To show that the board did not understand the experiment in Krauss, on appendix 24, the board says that there is endogenous CD28 that could bind to B7 on neighboring T cells. And concludes it is impossible to discern from Krauss whether the costimulatory signaling is from endogenous CD28 alone or both endogenous CD28 and the MIPI motif from the construct. What they're suggesting there is if she found costimulatory signaling, you wouldn't be able to tell what the binding was that caused it. That's a misunderstanding of the data. And at appendix 767 in the expert declaration, it's reflected there that the 3G6 CD28 and 3G6 CD28-TR, which the CD28-TR was a control that could not have stimulated costimulatory signaling, had the same amount of IL-2R expression as the CD28. So there was no costimulatory signaling that she found. Thank you, Mr. Dean.